**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**STEPHAN BRIECKE,**

                                **Plaintiff,**

        v.                                                  **9:12-CV-1271**
                                                                     **(MAD/RFT)**

**BRIAN FISCHER,** *et al.***,**

                                  **Defendants.**
_____

**APPEARANCES:**                                  **OF COUNSEL:**

**STEPHAN BRIECKE**
**85-A-4706**
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021
Plaintiff *pro se*

**HON. ERIC T. SCHNEIDERMAN**           **KRISTA A. ROCK, ESQ.**
New York State Attorney General            Ass't Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**MAE A. D'AGOSTINO**
**United States District Judge**

## DECISION AND ORDER

### I. INTRODUCTION

      Plaintiff Stephan Briecke commenced this *pro se* action pursuant to 42 U.S.C. § 1983 and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 120101 *et seq*. *See* Dkt. No. 1. Presently before the Court is Plaintiff's motion for preliminary injunctive relief. *See* Dkt. No. 5. Defendants

have responded in opposition to the motion for preliminary injunctive relief. *See* Dkt. No. 20.[1]

## II. DISCUSSION

**A.     Plaintiff's Complaint**

The following relevant facts are set forth as alleged by Plaintiff in his complaint.  Prior to his present incarceration, Plaintiff was diagnosed as being in the final stages of cirrhosis of the liver by Dr. Elenor Hobbs at the Northport Veterans Administration ("VA") Hospital and arrangements were being made to transfer Plaintiff to the Pittsburgh VA Hospital for a liver transplant. *See* Dkt. No. 1 at ¶ 3.  In August of 2011, Plaintiff was taken into custody on an alleged parole violation and sent to Downstate Reception Center, where he told Dr. Youseff about the recommendation and treatment plan put in place for him by the Northport VA. *See id.* at ¶ 4.  Dr. Youseff recommended that Plaintiff be seen by a gastroenterologist, ordered x-rays, and asked Plaintiff to obtain a copy of his VA medical records to be used as a "guideline." *See id*.  On September 7, 2011, Plaintiff received his VA medical records. *See id*. at ¶ 6.  Dr. Youseff reviewed the medical records in Plaintiff's presence and then "went straight to the Head Clerk[']s Office and put [P]laintiff in for a transfer to a medical facility." *See id*.  Despite Dr. Youseff's recommendation, Plaintiff was transferred to Attica Correctional Facility ("Attica C.F."). *See id*. at ¶ 8.

On September 8, 2011, Plaintiff was taken to Fishkill Medical Center and was interviewed by a hematologist and gastroenterologist "who reviewed [P]laintiff[']s medical records in conjunction with a physical examination and determined that a liver transplant was necessary as [P]laintiff was beyond

---

[1] Defendants' response to Plaintiff's motion for preliminary injunctive relief is combined with their motion for summary judgment. *See* Dkt. No. 20.  Plaintiff has also filed a cross-motion for summary judgment. *See* Dkt. No. 30.  These motions for summary judgment will be addressed by separate order.

treatment. [Plaintiff states that] [t]hese records are missing from [his] medical records [but] the trip can be verified via transport records etc." *See id.* at ¶ 7.

On September 20, 2011, Dr. Evans at the Attica Correctional Facility infirmary told Plaintiff that he was transferred to Attica to stop him from complaining about his lack of medical treatment. *See id.* at ¶ 9. Further, Dr. Evans told Plaintiff that he "would submit a consult for a Hepatitis Clinic [and] Gastrologist." *See id.* On September 30, 2011, Dr. Evans re-submitted the request for a consultation by a "Liver and Hepatitis Specialist." *See id.* at ¶ 12. On October 27, 2011, Plaintiff met with Dr. Gaff "who discussed the seriousness of [P]laintiff's cirrhosis condition" and told Plaintiff that because of his "low platelet and WBC counts, he was not a candidate for treatment – liver transplant was the only option." *See id.* at ¶ 15. On November 23, 2011, Dr. Gaff reviewed Plaintiff's medical records with him and had him sign medical contracts for appointments with "a Liver Specialist, Hepatitis Clinic, Audiologist, and undated lab work." *See id.* at ¶ 20.

On January 6, 2012, Plaintiff had an appointment with a "private outside Liver Specialist Dr. Abdula Chaudrey who also works out of Rochester Hospital and is on[e] of the designated surgeons to perform liver transplants on inmates" in custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See id.* at ¶ 23. According to Plaintiff, Dr. Chaudrey concluded that Plaintiff was in the final stages of cirrhosis and beyond treatment through medications; and, therefore, a liver transplant was the only option to correct Plaintiff's medical problems and that a liver biopsy should be conducted to determine whether any of Plaintiff's six siblings or mother were compatible donors. *See id.* at ¶ 24. Dr. Chaudrey had Plaintiff sign several medical contracts "for the procedures to be conducted at the Rochester Hospital," which were submitted to Defendant Dr. Koenigsmann, the Deputy Commissioner and Chief Medical Officer of DOCCS, for approval. *See id.* at ¶ 25.

3

On January 14, 2012, Plaintiff was transferred to Shawangunk Correctional Facility. *See id.* at ¶ 25. On February 14, 2012, Plaintiff had an appointment with Dr. Miller during which time he signed a contract for a specialty care appointment and "DOCCS scheduled Albany Medical Center Gastro Appointment." *See id*. at ¶ 32. Plaintiff was taken to Coxsackie Medical Center on March 2, 2012, and was seen by Dr. Robert MacDermott, a gastroenterologist who "referred to plaintiff as the walking dead via his comment: 'Do you have children? . . . Have you prepared a last will and testament for them?'" *See id*. When asked what he meant, Dr. MacDermott replied "That's all I can tell you without implicating myself!" *See id*. Dr. MacDermott prescribed various medications for Plaintiff, which Plaintiff claims he did not receive. *See id*. at ¶¶ 34, 57.

On May 2, 2012, Plaintiff was transferred to Walsh Regional Medical Center, at Mohawk Correctional Facility. *See id.* at ¶ 60. Upon his arrival, Physician Assistant Simmons told Plaintiff that he was brought there "To Die." *See id*. On May 9, 2012, Plaintiff was interviewed by Dr. Philip Holtzapple, a gastroenterologist, who recommended that "a biopsy be taken to determine the compatibility of a potential donor." *See id*. at ¶ 64.

On May 24, 2012, Plaintiff had an appointment with Dr. Pan, a Hemotologist at Syracuse ROC Oncology. *See id.* at ¶ 69. Dr. Pan discussed "what could have been done to prevent [Plaintiff's] condition from deteri[or]ating to the advanced stages he was presently experiencing. However, since these procedures were not followed, plaintiff[']s prognosis and treatment plan were conclusive in nature - plaintiff is terminal and the only possible treatment plan is a liver transplant." *See id*. Dr. Pan told Plaintiff that her recommendation to Defendants Fischer and Koenigsmann would "reflect same." *See id*.

On June 29, 2012, "[P]laintiff was informed by the Chart Nurse . . . [that] Defendant Koenigsmann had approved [the] request for a liver transplant. This was later confirmed by PA

4

Simmons that said transplant was approved on June 29, 2012." *See id.* at ¶ 87. "Since that date, staff at Walsh Medical Center have done everything within their power to make plaintiff as miserable as possible hoping that he would [be] den[ied] all medical treatment just to be transferred back to Attica over being housed at Walsh Medical Center." *See id.* at ¶ 88.

Plaintiff also alleges that DOCCS has refused to allow him to receive hearing aids that were prescribed to him by the Northport VA Hospital prior to his incarceration, but instead DOCCS "conducted hearing tests and made an independent finding that plaintiff would need hearing aids and ordered same on 8-17-11, 12-26-11 and 3-14-11." *See id.* at ¶¶ 21-22. Plaintiff claims that he was transferred to a new facility each time hearing aids were ordered, and as a result never received the hearing aids. *See id.*

Moreover, Plaintiff alleges that Defendants have been deliberately indifferent to his serious medical needs in violation of his constitutional rights, and have violated his rights under the ADA. *See generally* Dkt. No. 1. In light of these violations, Plaintiff requests monetary damages and injunctive relief.

**B.    Standard for Obtaining Preliminary Injunctive Relief**

Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, 38 (2d Cir. 2010) (citations omitted).

To prevail on a motion for preliminary injunctive relief, a plaintiff must demonstrate

5

irreparable harm and either a substantial likelihood of success on the merits of the claim, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *See id*. at 35 (citation omitted); *see also Cacchillo v. Insmed, Inc*., 638 F.3d 401, 405-06 (2d Cir. 2011) (citation omitted). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Id*.; *see also Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Thus, a mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Citigroup Global Mkts*., 598 F.3d at 35 n.4 (internal quotation marks omitted).

The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *See Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992) (citation omitted); *see also Perri v. Bloomberg*, No. 06-CV-403, 2008 WL 2944642, *2 (E.D.N.Y. Jul. 31, 2008). Preliminary injunctive relief "'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *See Moore*, 409 F.3d at 511 (citations omitted).

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.'" *Perri*, 2008 WL 2944642, at * 2 (quoting *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113-14 (2d Cir. 2003)); *see also Kamerling v. Massanari*, 295 F.3d 206, 214 (2d

6

Cir. 2002) (holding that "[t]o establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation" (internal quotation omitted)). Moreover, speculative, remote, or future injury is not the province of injunctive relief. *See Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983); *see also Hooks v. Howard*, No. 9:07-CV-0724 (RFT), 2008 WL 2705371, *2 (N.D.N.Y. July 3, 2008) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages") (citation omitted).

**C.     Assessment of Plaintiff's Motion**

Construing Plaintiff's motion for preliminary injunctive relief liberally, Plaintiff alleges a violation of his Eighth Amendment right to adequate medical care. Since an alleged violation of a constitutional right "triggers a finding of irreparable harm," the Court **will assume for purposes of this motion only** that Plaintiff satisfies the requirement that a party applying for a preliminary injunction show irreparable harm. *Jolly*, 76 F.3d at 482; *see also Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary"). Although the Court assumes, without deciding, that Plaintiff has shown irreparable harm, Plaintiff's request for preliminary injunctive relief is nonetheless denied for the reasons that follow.

*1. Treatment for Liver Disease*

Plaintiff requests a court order "enjoining the Defendants from continuing to deny Plaintiff a life saving surgery, *i.e.*, a liver transplant . . . as repeatedly recommended by Gastrologists" and from future retaliation for exercising his rights to file complaints and seek medical care. *See* Dkt. No. 5 at 1, 4. "In addition, or in the alternative, Plaintiff urges the Court to require the Defendants to immediately transfer Plaintiff to the Rochester Hospital which is the hospital the NYS DOCCS was contracted with to perform liver transplants." *See id*. In support of his request, Plaintiff proffers his own declaration, wherein he states that between February 11, 2011, and May 24, 2012, he was evaluated by six different physicians – Dr. Hobbs, an unnamed gastroenterologist at Fishkill Medical Center, Dr. Chaudrey, Dr. MacDermott, Dr. Holtzapple, and Dr. Pan. *See id*. at 1-2.[2] Plaintiff alleges that all of the foregoing specialists found that he "was beyond treatment and made a Recommendation to the Defendants that Plaintiff undergo a liver transplant and each had Plaintiff sign a Contract for Medical Treatment [but within ten] days of each recommendation the Defendants transferred Plaintiff to another facility to start the process all over again." *See id*. at 2.

Defendant Koenigsmann, the Deputy Commissioner and Chief Medical Officer of DOCCS, has

---

[2] In support of his motion for preliminary injunctive relief, Plaintiff refers the Court to various allegations contained in his complaint. *See* Dkt. No. 5 at 1. In particular, Plaintiff refers the Court to the following portions of his complaint: paragraphs 3-6 (alleging that he was evaluated by Eleanor Hobbs, M.D. on February 11, 2011, at Northport VA Hospital and found to be in need of a liver transplant); paragraphs 4-7 (alleging that on September 8, 2011, he was evaluated by a gastroenterologist at Fishkill Medical Center and found to be in need of a liver transplant); paragraphs 23-25 (alleging that he was evaluated by Dr. Abdula Chaudrey on January 6, 2012, and found to be in need of a liver transplant); paragraph 34 (alleging that he was evaluated by Robert MacDermott, M.D. on March 12, 2012, at Coxsackie Medical Center, and found to be in need of a liver transplant); paragraph 64 (alleging that he was evaluated by Philip Holtzapple, M.D. on May 9, 2012, at Walsh Medical Center, and found to be in need of a liver transplant); and paragraph 69-79 (alleging that on May 24, 2012, he was evaluated by Dr. Pan, a Hemotologist from the Syracuse Oncology Department, and found to be in need of a liver transplant). *See id*. at 1-2 (citing Dkt. No. 1 at ¶¶ 3-7, 23-25, 34, 64, and 69-70).

8

submitted an Affidavit in opposition to Plaintiff's motion. *See* Dkt. No. 20-4. According to Defendant Koenigsmann, a review of Plaintiff's medical records since his return to the custody of DOCCS on August 5, 2011, demonstrates that "his facility physicians have been regularly monitoring his various medical complaints, including his liver ailments." *See id*. at ¶ 7. Further, Defendant Koenigsmann states that "Plaintiff's facility physicians and outside specialists have determined that continued monitoring of the condition of plaintiff's liver, while deferring treatment, is appropriate." *See id*. at ¶ 8. "Pursuant to [DOCCS] Clinical Practice Guidelines, when an inmate's primary care physician decides that he is a possible candidate for a liver transplant, the recommendation is submitted to [me as] the Chief Medical Officer for approval." *See id*. at ¶ 11.

According to Defendant Koenigsmann, on June 28, 2012, Plaintiff was approved for a liver transplant evaluation. *See id*. at ¶ 18. "In evaluating patients with liver disease, the specialist relies upon the Model for End-Stage Liver Disease (MELD) system, which was implemented in 2002 to prioritize patients waiting for a liver transplant." *See id*. at ¶ 14. "MELD is a numerical scale used for adult liver transplant candidates. The range is from 6 (less ill) to 40 (gravely ill). The individual score determines how urgently a patient needs a liver transplant within the next three months. The number is calculated using the most recent laboratory tests." *See id*. at ¶ 15. On October 2, 2012, Plaintiff was seen for transplant evaluation by gastroenterologist Benedict Maliakkal. *See id*. at ¶ 21; *see also* Dkt. No. 21 at 11 (Ex. D). "At the time of plaintiff's consultation with the gastroenterologist [Maliakkal], his MELD score was 9." *See* Dkt. No. 20-4 at ¶ 22; *see also* Dkt. No. 21 at 11 (Ex. D). According to his Consultation Report dated October 3, 2012, Dr. Maliakkal concluded "with MELD score 9, too early for liver transplant referral." Dkt. No. 21 at 11 (Ex. D). "Thus, at this time, plaintiff is not even considered a candidate for a liver transplant, though his condition warrants continued monitoring." *See* Dkt. No. 20-4 at ¶ 25. Dr. Maliakkal ordered follow-up care and Defendant Koenigsmann states

that DOCCS has complied with Dr. Maliakkal's recommendations. *See id.* at ¶¶ 24, 26. Additionally, Defendant Koenigsmann states that "a transplant for plaintiff is further contraindicated based on his history of noncompliance with medical recommendations." *See id.* at ¶¶ 27-28;[3] *see also* Dkt. No. 21 at 13-31 (Exs. E, F).

The gravamen of this portion of Plaintiff's request for preliminary injunctive relief is his alleged urgent need for liver transplant to save his life. Plaintiff's request for relief is mandatory in nature, *i.e.*, he seeks an injunction requiring DOCCS to provide a specific form of treatment, and, therefore the more stringent standard of a "clear" or "substantial" likelihood of success applies.[4] Plaintiff has failed to meet this stringent standard. In any event, Plaintiff's motion would also fail under the lesser "likelihood of success" or "serious questions going to the merits" standard.

Based upon the record before the Court, Plaintiff was examined by a liver specialist in October, 2012, who concluded that Plaintiff had a MELD score of "9", and it was therefore "too early" for Plaintiff to be considered a candidate of a liver transplant. *See* Dkt. No. 21 at 11. While Plaintiff claims that between February 11, 2011 and May 24, 2012, he was evaluated by six different physicians – Dr. Hobbs, an unnamed gastroenterologist at Fishkill Medical Center, Dr. Chaudrey, Dr. MacDermott, Dr. Holtzapple, and Dr. Pan – who each concluded that Plaintiff's only remaining course of treatment was a liver transplant, he has not submitted evidence to substantiate this claim. Indeed, of the six specialists that Plaintiff refers to, Plaintiff has only provided medical records regarding his evaluation by Dr. Pan on May 24, 2012. *See* Dkt. No. 30-3 at 48-51. Dr. Pan's report, which was

---

[3] Defendant Koenigsmann states that "a refusal of medical care is deleterious to [Plaintiff's] health and a history of such is a contraindication to a transplant where strict compliance with medication is tantamount to success." *See id.* at ¶ 30.

[4] Although in part Plaintiff seeks to enjoin Defendants from interfering with his need for a liver transplant, he is actually seeking to change the status quo regarding his medical treatment.

issued almost five months before Plaintiff was evaluated by Dr. Maliakkal, recommended the following plan: "Obtain CBC, CMP today.  Continue to proceed with assessment for liver transplantation," and schedule a return appointment for Plaintiff for four weeks later.  *See id*. at 48.  The record reflects that Plaintiff was subsequently evaluated for a liver transplant in October, 2012, and found to not yet be a candidate for transplant.  *See* Dkt. No. 20-4 at ¶ 22; *see also* Dkt. No. 21 at 11 (Ex. D).  Although, construed liberally, Plaintiff seems to claim that Defendants are intentionally delaying a liver transplant, the record does not support Plaintiff's contention that he qualifies for a liver transplant at this time.  In fact, the record refutes Plaintiff's contention that he is a candidate for, and in urgent need of, a liver transplant.  *See* Dkt. No. 21 at 11 (Ex. D) (noting that, as of October 3, 2012, Plaintiff's MELD score of 9 indicates that it is "[t]oo early for liver transplant referral").  Plaintiff offers no evidence to rebut this most recent medical assessment.  Moreover, a review of Plaintiff's medical records submitted in this action shows that Plaintiff received substantial medical care and treatment for his liver disease and other medical issues, including multiple consultations with outside specialists.  *See* Dkt. No. 21; *see also* Dkt. No. 30-3.  Thus, the record belies Plaintiff's claim that Defendants have been deliberately indifferent to his serious medical needs.

In reply to Defendants' opposition, Plaintiff alleges that on October 8, 2012,[5] after his evaluation by Dr. Maliakkal, Plaintiff "experienced a severe bleed-out and was once again taken to Syracuse University Medical Center where he was prepped for- and underwent another band for varices in his esophagus. Due to the amount of blood Plaintiff had lost, Dr. Sampath scheduled Plaintiff to undergo both a CAT Scan and Ultrasound to ascertain the condition of Plaintiff's liver."

---

[5] Plaintiff incorrectly identifies the date of his ambulance transport as October 2, 2012.  His medical records, and the report of Dr. Sampath, indicate the correct date to be October 8, 2012. *See* Dkt. No. 30-3 at 77, 83.

*See* Dkt. No. 17 at 6.  Plaintiff claims that the "results of the CAT Scan and Ultrasound revealed that [his] liver was no longer functional."  *See id.*  The record, however, does not support Plaintiff's assertion that tests ordered by Dr. Sampath on October 8, 2012, demonstrated that his "liver was no longer functional."  *See* Dkt. No. 30-3 at 83 (Consultation Report of Dr. Sampath dated October 8, 2012).[6]

Finally, to the extent that Plaintiff is questioning, or disagrees with, the type of medical care that he is receiving from DOCCS, absent clear and convincing evidence to the contrary, the Court is not inclined to second guess the judgments made by medical professionals.  "Determinations made by medical providers within their discretion are given a 'presumption of correctness' when it concerns the care and safety of patients."  *Mendoza v. McGinnis*, No. 9:05-CV-1124 (TJM/DEP), 2008 WL 4239760, *11 (N.D.N.Y. Sept. 11, 2008).

Plaintiff has failed to introduce sufficient evidence of conduct on the part of Defendants which rises to the level of deliberate indifference to serious medical need (liver disease).  Nor has Plaintiff submitted documentation which indicates that his only course of treatment is an immediate liver transplant.  By contrast, Defendants have submitted evidence demonstrating that Plaintiff is not yet a candidate for a liver transplant, and that Plaintiff has received significant medical care, including referral to several specialists, diagnostic testing, hospitalization, and surgery.  While the Court empathizes with Plaintiff's liver disease and his alleged need for a transplant, after thoroughly considering the record before it, the Court finds that Plaintiff has failed to meet the burden required for

---

[6] Dr. Sampath's Report indicate's that Plaintiff had a MELD score of 13.  *See* Dkt. No. 30-3 at 83; s*ee also* Dkt. No. 20-4 at ¶ 15 ("MELD is a numerical scale used for adult liver transplant candidates.  The range is from 6 (less ill) to 40 (gravely ill). The individual score determines how urgently a patient needs a liver transplant within the next three months.  The number is calculated using the most recent laboratory tests").

issuance of the preliminary injunctive relief requested.

### *2. Hearing Aids*

Plaintiff seeks a court order directing Defendants to provide him with the hearing aid devices ordered by audiologists. *See* Dkt. No. 5 at 1. Defendant Koenigsmann states that DOCCS' "computer records demonstrate [that Plaintiff had] four visits with an audiologist since his return to DOCCS custody, the most recent being October 4, 2012 [and it] appears hearing aids were recommended but, because of his transfer from one facility to another [as of November 19, 2012 he had] not yet received them." *See* Dkt. No. 20-4 at ¶¶ 32, 33. Defendant Koenigsmann alleges that Plaintiff was scheduled for an audiology referral for hearing aids on November 21, 2012. *See id*. at ¶ 34. The record indicates that Plaintiff "was fitted for bilateral hearing aids and instructed on their care and use on 11/21/12." *See* Dkt. No. 30-3 at 22 (Central Office Review Committee response to Plaintiff's grievance appeal). Thus, Plaintiff's request for preliminary injunctive relief ordering DOCCS to provide him with hearing aids is likely moot. The Court qualifies this finding of mootness as "likely" because it appears that the hearing aids received by Plaintiff on November 21, 2012, may have been defective. *See* Dkt. No. 30-3 at 20 (Plaintiff's December 3, 2012 grievance complaining that staff at Auburn Correctional Facility "charg[ed him] for the defective Hearing Aids received on 11-21 [which] died on 11-24"). It is unclear from Plaintiff's grievance whether the "allegedly defective" hearing aids received on November 21, 2012, were ever repaired or replaced. The Court notes, however, that Plaintiff's grievance does not seek replacement or repair; it only requests that he not be charged for repair. *See* Dkt. No. 30-3 at 20. Further, Plaintiff does not indicate how the grievance was resolved.

Even if the request for hearing aids is not moot, this aspect of Plaintiff's motion for preliminary injunctive relief is nevertheless denied. With respect to any delay in receiving hearing aids, Plaintiff

has failed to introduce sufficient evidence of conduct on the part of Defendants which rises to the level of deliberate indifference, and thus has not demonstrated at this stage of the proceeding that he is likely to succeed on the merits of this claim, let alone the "clear" or "substantial" likelihood of success that applies to mandatory injunctive relief.

After reviewing the record in its entirety, the Court finds that Plaintiff has failed to meet the burden required for issuance of the preliminary injunctive relief with respect to his request for hearing aids.

### III. CONCLUSION

For all of the foregoing reasons, Plaintiff's motion for preliminary injunctive relief (Dkt. No. 5) is denied in its entirety.[7]

**WHEREFORE**, the Court hereby

**ORDERS** that Plaintiff's motion for preliminary injunctive relief (Dkt. No. 5) is **DENIED**; and the Court further

**ORDERS** Plaintiff's motion to expedite the request for preliminary injunctive relief (Dkt. No. 17) is **DENIED as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED.**

Dated: March 7, 2013
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[7] Although the Court has denied Plaintiff's motion for preliminary injunctive relief because Plaintiff has not met his burden to entitle him to such relief, the Court makes no finding at this time regarding the ultimate merits of his claims.