**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**STEPHAN BRIECKE,**

                 **Plaintiff,**

    v.                                               9:12-CV-1271
                                                      (MAD/RFT)

**BRIAN FISCHER,** *Commissioner, NYS DOCCS*;
**CARL J. KOENIGSMANN,** *Deputy Commissioner,*
*NYS DOCCS*; **JASON RYAN,** *Classification Analyst*;
**and MARIANN AMODIO,** *NYS DOCCS*,

                 **Defendants.**

---

**APPEARANCES:**                                   **OF COUNSEL:**

**STEPHAN BRIECKE**
**130022619**
Turner Guilford Knight Correctional Center
7000 NW 41st Street
Miami, Florida 33166
Plaintiff *pro se*

**HON. ERIC T. SCHNEIDERMAN**           **LAURA A. SPRAGUE, AAG**
New York State Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff Stephan Briecke, who is proceeding *pro se* and *in forma pauperis*, commenced this action by filing a complaint pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act, 41 U.S.C. §12101, *et seq.* ("ADA"). *See* Dkt. No. 1. Liberally construed, Plaintiff's complaint alleged that Defendants were deliberately indifferent to his serious medical needs in

violation of his constitutional rights and that they violated his rights under the ADA. *See generally* Dkt. No. 1. Defendants have filed a motion for summary judgment. *See* Dkt. No. 20. Plaintiff has responded to this motion and filed a cross motion for summary judgment. *See* Dkt. No. 30.

Currently before the Court are the parties' cross-motions for summary judgment and Plaintiff's motion to compel.

## II. BACKGROUND[1]

Plaintiff commenced this suit while he was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See* Dkt. No. 1 at ¶ 2. Plaintiff has since been released from DOCCS' custody. *See* Dkt. No. 41. At all times relevant to this action, Defendants were employed by DOCCS. *See* Dkt. No. 20-1 at ¶ 2.

Prior to his incarceration, Plaintiff was diagnosed as being in the final stages of cirrhosis of the liver by Dr. Elenor Hobbs at the Northport Veterans Administration ("VA") Hospital and arrangements were being made to transfer Plaintiff to the Pittsburgh VA Hospital for a liver transplant. *See* Dkt. No. 1 at ¶ 3. In August of 2011, Plaintiff was taken into custody on an alleged parole violation and sent to Downstate Reception Center, where he told Dr. Youseff about the recommendation and treatment plan put in place for him by the Northport VA. *See id.* at ¶ 4. Dr. Youseff recommended that Plaintiff be seen by a gastroenterologist, ordered x-rays, and asked Plaintiff to obtain a copy of his VA medical records to be used as a "guideline." *See id.*

---

[1] The factual information set forth in the "Background" section of this Memorandum-Decision and Order are taken from Defendants' Statement of Material Facts, Plaintiff's complaint and opposition to Defendants' motion for summary judgment, the material submitted in support of Plaintiff's motion for summary judgment, and the medical records submitted in support and response to the pending motions.

2

In accordance with New York Correction Law §§ 5 and 7, as Commissioner, Defendant Fischer is the Chief Executive Officer of DOCCS and is responsible for the overall management of DOCCS. *See* Dkt. No. 20-1 at ¶ 3. Defendant Fischer delegates decisions concerning the medical care of inmates to medical staff employed and retained by DOCCS to provide inmates with medical assistance. *See id.* at ¶ 4. Defendant Fischer relies upon DOCCS' professional medical staff and outside specialists to exercise their professional judgment in conducting their assessments and determinations regarding appropriate medical assistance. *See id.* at ¶ 5.

Defendant Koenigsmann is Deputy Commissioner and Chief Medical Officer of DOCCS. *See id.* at ¶ 8. He is responsible for the development and implementation of medical policies and practices for inmates in the custody of DOCCS. *See id.* Defendant Koenigsmann is not and has never been responsible for the primary care of Plaintiff and has never seen him in person for care, examinations or referrals. *See id.* at ¶ 9. Defendant Koenigsmann asserts, and Plaintiff does not contend otherwise, that his only involvement with Plaintiff was his approval of an evaluation for a liver transplant requested by his primary care provider. *See id.* at ¶ 10. Plaintiff's facility physicians and outside specialists have determined that continued monitoring of the condition of Plaintiff's liver, while deferring treatment, is the appropriate course of treatment. *See id.* at ¶ 14.

DOCCS develops and regularly updates its Clinical Practice Guidelines for various diseases to maintain an acceptable level of care for those in DOCCS custody. *See id.* at ¶ 15. The guidelines are developed by a "task force of physicians involving some who practice in the DOCCS system and experts in the field of the disease being considered." *See id.* The task forces consider national guidelines, national consensus statements and recommendations as well as well-grounded articles in peer-reviewed medical journals." *See id.*

Pursuant to DOCCS' Clinical Practice Guidelines, when an inmate's primary care

3

physician decides that he is a possible candidate for a liver transplant, the recommendation is submitted to the Chief Medical Officer for approval. *See id.* at ¶ 17. It is Defendant Koenigsmann's responsibility to review the recommendation and decide whether or not to approve a referral to a specialist for liver transplant consideration. *See id.* at ¶ 18. If Defendant Koenigsmann gives such approval, the patient is referred to a gastroenterologist, who evaluates the patient's need for a transplant and makes a recommendation. *See id.* at ¶ 19. If that specialist determines that a transplant is necessary, he or she would then refer the patient to a transplant surgeon for further evaluation. *See id.*

In evaluating patients with liver disease, the specialist relies upon the Model for End-Stage Liver Disease ("MELD") system, which was implemented in 2002 to prioritize patients waiting for a liver transplant. *See id.* at ¶ 20. MELD is a numerical scale used for adult liver transplant candidates. *See id.* at ¶ 21. The range is from 6 (less ill) to 40 (gravely ill). *See id.* The individual score determines how urgently a patient needs a liver transplant within the next three months. *See id.* The number is calculated using the most recent laboratory tests. *See id.* The following laboratory values are used in the MELD calculation:

- Bilirubin, which measures how effectively the liver excretes bile;

- INR (formally known as the prothrombin time), measures the liver's ability to make blood clotting factors;

- Creatinine, which measures kidney function. Impaired kidney function is often associated with severe liver disease.

*See id.* at ¶ 22.

According to DOCCS' records, Plaintiff's primary care provider requested a liver transplant evaluation on May 11, 2012, and it was denied on May 16, 2012, pending review by the Chief Medical Officer (Defendant Koenigsmann). *See id.* at ¶ 23; Dkt. No. 20-4 at ¶ 17. The

request was resubmitted, and Defendant Koenigsmann approved it on June 28, 2012. *See id.* at ¶ 24; Dkt. No. 20-4 at ¶ 18. Testing and consultation were completed in September and October of 2012. *See id.* at ¶ 25; Dkt. No. 20-4 at ¶ 19.

On October 2, 2012, a report on Plaintiff's most recent test results was completed and Plaintiff was seen for transplant evaluation by gastroenterologist Benedict Maliakkal. *See id.* at ¶¶ 26-27; Dkt. No. 20-4 at ¶¶ 20-21. At the time of Plaintiff's consultation with Dr. Maliakkal, his MELD score was nine (9). *See id.* at ¶ 28; Dkt. No. 20-4 at ¶ 22. Following his examination, Dr. Maliakkal concluded that, "'with MELD score 9, too early for liver transplant referral.'" *See id.* at ¶ 29; Dkt. No. 20-4 at ¶ 23. Dr. Maliakkal ordered an endoscopy ("EGD") "'done prophylactically till banding eradicates varices, then quarterly thereafter.'" *See id.* at ¶ 30. DOCCS' computer records indicate that the ordered endoscopy was completed at Walsh Regional Medical Unit on October 24, 2012, three weeks after Dr. Maliakkal's recommendation. *See* Dkt. No. 20-4 at ¶ 26.

Defendants argue that, in addition to the fact that Dr. Maliakkal found that it was too early to consider a liver transplant, a transplant for Plaintiff is further contraindicated by his history of noncompliance with medical recommendations. *See* Dkt. No. 20-1 at ¶ 33. Since his return to custody in August 2011, Plaintiff has often refused medical treatment and prescribed medications. *See id.* at ¶ 34. Plaintiff's medical records include numerous signed refusals and his ambulatory health record reveals that he has repeatedly refused insulin and other prescribed medications. *See id.* (citing Koenigsmann Aff, ¶ 28; Exhibit F); *see also* Dkt. No. 21 at Exhibits "E" and "F."

In addition, Plaintiff also alleges that DOCCS has refused to allow him to receive hearing aids that were prescribed to him by the Northport VA Hospital prior to his incarceration, but instead DOCCS "conducted hearing tests and made an independent finding that plaintiff would

5

need hearing aids and ordered same on 8-17-11, 12-26-11 and 3-14-11." *See* Dkt. No. 1 at ¶¶ 21-22. Plaintiff claims that he was transferred to a new facility each time hearing aids were ordered, and as a result never received the hearing aids. *See id.*

Defendants contend that their computer records indicate that Plaintiff has visited with an audiologist four times since his return to DOCCS custody; the most recent occurring on October 4, 2012. *See* Dkt. No. 20-1 at ¶ 38; Dkt. No. 21 at Exhibit "G." Defendants assert that it appears that hearing aids were recommended for Plaintiff, but because of his transfer from one facility to another, he did not receive them. *See id.* at ¶ 39; Dkt. No. 21 at Exhibit "G" at 35 (indicating in medical notes at Shawangunk C.F. on March 14, 2012 that Plaintiff had not yet received his hearing aids because the audiologist (John Serhan) was waiting for the devices to be sent from Attica C.F. where they were first ordered). Moreover, according to Defendants, an audiology appointment was requested for Plaintiff on October 4, 2012 and Plaintiff was seen on November 21, 2012. *See* Dkt. No. 36-2 at ¶ 4. During that same visit, Plaintiff was fitted for and received bilateral hearing aids. *See id.* at ¶ 5. On December 4, 2012, Plaintiff was scheduled for another appointment with the audiologist. *See id.* at ¶ 6. Plaintiff, however, cancelled the appointment, complained that his hearing aids were not working, and then threw them in the trash. *See id.*; *see also* Dkt. No. 36-2 at 8.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 120101 *et seq.* Plaintiff alleges that Defendants have been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and that Defendant violated the ADA. Plaintiff requests monetary damages and injunctive relief. *See* Dkt. No. 1.

In support of their motion for summary judgment, Defendants raise the following

6

arguments: (1) state officials sued in their official capacities are entitled to Eleventh Amendment immunity; (2) the complaint fails to allege a claim under the ADA; (3) Plaintiff failed to establish the personal involvement of any of the named Defendants; (4) the record does not support Plaintiff's claims of deliberate indifference to serious medical needs; and (5) Defendants are entitled to qualified immunity.  *See* Dkt. No. 20-6.  Plaintiff has opposed Defendants' motion and has cross-moved for summary judgment.  *See* Dkt. No. 30.

### III. DISCUSSION

**A.     Standard of review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the

7

court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (qquoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B.     Plaintiff's claims for injunctive relief**

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.'" *Van Wie v. Pataki*, 267 F.3d 109, 113 (2d Cir. 2001) (citations omitted). A federal court has no authority to

8

decide an issue when the relief sought can no longer be given, or is no longer needed. *See Martin–Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (quotation omitted). Since mootness is a jurisdictional question, it must precede the determination of substantive issues and it may be raised *sua sponte*. *See Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 356 Fed. Appx. 452, 454 (2d Cir. 2009) (citations omitted).

In the present matter, on April 9, 2013, Plaintiff was transferred from the Cayuga County Jail to the Turner Guilford Knight Correctional Center in Miami, Florida. *See* Dkt. No. 41. Moreover, DOCCS' website shows that Plaintiff was released from Auburn Correctional Facility on March 15, 2013. *See* N.Y.S. D.O.C.C.S., Inmate Information, available at http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited September 19, 2013). Since Plaintiff is no longer in DOCCS custody, all claims for injunctive relief are dismissed as moot. *See MacGillivray v. Whidden*, No. 3:04CV1523, 2006 WL 587593, *4 (D. Conn. Mar. 10, 2006) (finding inmate's claims for prospective injunctive relief moot because he had since been released from custody) (citing cases).

Based on the foregoing, the Court dismisses Plaintiff's claims for prospective injunctive relief as moot.

**C.    Eleventh Amendment immunity**

The Eleventh Amendment to the United States Constitution bars federal courts from

9

exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90-100 (1984). Congress did not abrogate the Eleventh Amendment immunity granted to the states when it enacted 42 U.S.C. § 1983 because it is well-settled that states are not "persons" under section 1983. *See Quern v. Jordan*, 440 U.S. 332, 240-41 (1979); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation omitted). Moreover, because a suit against a state official in his or her official capacity is considered a suit against the entity that employs the official, this immunity extends to state agencies and state officials sued in their official capacities. *See Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (citation omitted); s*ee also Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

In the present matter, although Plaintiff has brought claims pursuant to section 1983 against Defendants in both their individual and official capacities, the claims against Defendants in their official capacities are precluded by the Eleventh Amendment. *See* Dkt. No 1-1 at 8; *see Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (finding that DOCCS employees are state officials for purposes of section 1983); *Booker v. Rock*, No. 9:11-CV-247, 2012 WL 501629, \*2 (N.D.N.Y. Jan. 31, 2012) (citations omitted). In light of this authority, the Court grants Defendants' motion for summary judgment as to Plaintiff's claims against Defendants in their official capacities.

**D.    The ADA**

Title II of the ADA applies to prisoners. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 2010 (1998). The Second Circuit has held, however, that "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits [for damages]." *Garcia*

10

*v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). As such, to the extent that Plaintiff seeks damages against Defendants in their individual capacities, the claims must be dismisses. Moreover, insofar as Plaintiff seeks damages from these Defendants in their official capacities, such claims are barred by the Eleventh Amendment. *See id.* at 107. Although "Title II and Rehabilitation Act suits for prospective injunctive relief may . . . proceed against individual officers in their official capacity," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), an inmate's request for injunctive relief becomes moot when the inmate is released from custody. *See Roque v. Armstrong*, 392 F. Supp. 2d 382, 386-87 (D. Conn. 2005) (finding that the plaintiff's request for injunctive relief under the ADA for the provision of medical care became moot when he was discharged from prison) (citations omitted); *see also McAlpine v. Thompson*, 187 F.3d 1213, 1215 (10th Cir. 1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot upon his release from confinement).

Based on the foregoing, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment as to Plaintiff's ADA claims .[2]

**E.     Personal Involvement**

"It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Therefore, a supervisory official may not be held liable solely on the ground that they held a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citation

---

[2] Since the Court has *sua sponte* dismissed Plaintiff's claim for prospective injunctive relief as moot, the Court will not address the merits of the claim.

omitted). However, supervisory personnel may satisfy the personal involvement requirement if:

> (1) The defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Coughlin*, 58 F.3d at 873.

Personal involvement is a question of fact and must be satisfied as to each individual defendant. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citation omitted). "A plaintiff asserting a § 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation." *Rivera v. Fischer*, 655 F. Supp. 2d 235, 237 (W.D.N.Y. 2009). Merely writing a letter of complaint does not provide the personal involvement necessary to maintain a section 1983 claim against an individual defendant. *See id.* at 238. However, if the official "personally look[s] into the matters raised in the letter, or otherwise acts on the prisoner's complaint or request, the official may be found to be personally involved." *Id.* (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)).

### *1. Defendants Koenigsmann and Fischer*

Plaintiff has failed to provide the Court with any evidence or non-conclusory allegations to suggest that Defendants Koenigsmann and Fischer were personally involved in any of the alleged deprivations. Plaintiff claims that they were personally involved in the deprivations because, although they claim to defer to the judgment of specialists regarding the appropriate

12

course of medical treatment, these Defendants failed to follow the treatment recommended by the specialists. *See* Dkt. No. 30 at 3. Plaintiff alleges that this treatment was withheld because he was to be released within twelve months. *See id.* at 3-4. Moreover, Plaintiff appears to allege that Dr. Maliakkal's conclusion that it was too early for a liver transplant was rendered solely because he is a DOCCS' employee and is contradicted by the fact that Plaintiff was hospitalized five (5) days after this diagnosis and forced to undergo three emergency procedures relating to his liver condition. *See id.* at 4.

Contrary to Plaintiff's conclusory assertions, the Court finds that the undisputed facts establish that Defendants Koenigsmann and Fischer were not personally involved in any of the alleged deprivations. Defendant Fischer was not involved in Plaintiff's medical care in any way. *See* Dkt. No. 20-3 at ¶ 9. Defendant Koenigsmann is not and has never been responsible for the primary care of Plaintiff, nor has he seen Plaintiff in person for care, examination or referrals. *See* Dkt. No. 20-6 at ¶ 3. Defendant Koenigsmann's only involvement with Plaintiff's medical care was in approving the liver transplant evaluation requested by Plaintiff's primary care provider. *See id.* at ¶¶ 11, 18. As such, Defendant Koenigsmann actually assisted Plaintiff in obtaining the ultimate relief he seeks.

Moreover, to the extent that Plaintiff is alleging that either of these Defendants failed to adequately respond to his complaints regarding his medical care, it is well settled that the mere act of making a complaint to a supervisory official regarding alleged misconduct is clearly insufficient to render that supervisory official personally involved in the alleged misconduct. *See Lewis v. Berg*, No. 00-Civ.-1433, 2006 WL 1064174, *4 (N.D.N.Y. Apr. 20, 2006) (citations omitted).

Finally, nothing in the record suggests that Defendants Koenigsmann and Fischer were in

13

any way involved in the delay Plaintiff experienced in receiving his hearing aids. *See* Dkt. No. 20-3; Dkt. No. 20-4. Plaintiff's conclusory allegations to the contrary are insufficient to defeat Defendants' motion for summary judgment.

Based on the foregoing, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment as to Plaintiff's claims against Defendants Koenigsmann and Fischer.

### *2. Defendants Ryan and Amodio*

Plaintiff alleges that Defendants Ryan and Amodio were deliberately indifferent to his medical needs, and that they "willfully and intentionally transferred plaintiff every time a liver specialist submitted a consultation for plaintiff to undergo a liver transplant as well as every time plaintiff was evaluated for . . . and hearing aides were ordered." *See* Dkt. No. 1 at 22-23.

According to their affidavits, Defendants Ryan and Amodio are employed by DOCCS as "Classification Analysts." *See* Dkt. No. 20-2 at ¶ 3; Dkt. No. 20-5 at ¶ 3. According to these Defendants, as Classification Analysts, their responsibilities include "observing, analyzing and prescribing placement policies and procedures at assigned facilities. [They] review and make final determinations on facility transfer recommendations and advise alternate placement and programmatic options for inmates. These determinations are based upon input from other appropriate offices (*e.g.*, Health Services, Mental Health Services, Program Services)." *See* Dkt. No. 20-2 at ¶ 4; Dkt. No. 20-5 at ¶ 4. Although the often rely on requests received from Central Office Health Services for transferring inmates for medical reasons, they have no role regarding the medical treatment provided. *See* Dkt. No. 20-2 at ¶ 5; Dkt. No. 20-5 at ¶ 5.

Moreover, the record makes clear that Plaintiff was transferred on September 9, 2011 from

14

the receiving facility, Downstate C.F., to Attica C.F., and this decision was based on input from the reception center and Plaintiff's meeting criteria for that facility and available space. *See id.* at ¶ 11; Dkt. No. 20-5 at ¶ 11. Moreover, the undisputed facts make clear that Plaintiff was transferred to Shawangunk C.F. on January 20, 2012, because it was recommended that he participate in sex offender programming. *See id.* at ¶ 12; Dkt. No. 20-5 at ¶ 12. Neither of these Defendants played any role in determining that Plaintiff should be transferred as alleged. *See id.* at ¶ 14; Dkt. No. 20-5 at ¶ 14.

Based on the foregoing, the Court finds that Plaintiff has failed to establish that either Defendant Ryan or Defendant Amodio was personally involved in the alleged unconstitutional conduct. As such, the Court grants Defendants motion for summary judgment and denies Plaintiff's cross-motion for summary judgment as to Plaintiff's claims against Defendants Ryan and Amodio.

**F.     Deliberate Indifference[3]**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Hathaway*, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."

---

[3] Although the Court has found that none of the named Defendants were personally involved in the alleged unconstitutional conduct, the Court will still address the merits of Plaintiff's deliberate indifference claims.

*Hathaway*, 37 F.3d at 66.

The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *See id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quotation omitted). Since there is no distinct litmus test, whether a medical condition is serious depends on certain factors, such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing *Chance*, 143 F.3d at 702). The court should also judge the severity of the denial of care within the context of the surrounding facts and circumstances of the case. *See Smith*, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance*, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the

16

treatment was adequate. *Id*. at 703; *Chance*, 143 F.3d at 703 (finding that mere disagreement with the prescribed treatment does not amount to deliberate indifference to a serious medical need). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Finally, while "[c]ruel and unusual punishment may consist of prison officials delaying an inmate['s] access to needed medical care," *Kaminsky v. Rosenblum*, 929 F.2d 922, 926 (2d Cir. 1991), the case law of this Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (table) (affirming summary judgment for the defendants where the plaintiff received knee surgery approximately three years after sustaining the underlying injury) (internal citations omitted).

In the present matter, the undisputed facts in the record demonstrate the absence of any genuine issue of material fact as to Defendants' alleged deliberate indifference. Initially, the medical record makes clear that Plaintiff's medical complaints have been consistently addressed by facility medical personnel and outside referrals during his stay in DOCCS custody. *See* Dkt. No. 21 at 1-36. In addition, Plaintiff was transferred to the Walsh Regional Medical Unit ("Walsh RMU") for a period of more than three months in order to provide more thorough attention to his medical complaints. Regional Medical Units, such as Walsh RMU, have been established by DOCCS to provide long-term nursing care and rehabilitative services to inmates whose conditions require a higher level of care than is available in the general prison population. *See Rosario v. New York State Dep't of Corr. Servs.*, 2003 WL 22429271, *1 (S.D.N.Y. Sept. 24, 2003).

Moreover, although Plaintiff claims that he has not received a liver transplant in a timely manner, the record is devoid of any evidence demonstrating deliberate indifference with respect to that medical issue. When Plaintiff's primary care provider requested a liver transplant evaluation, Defendant Koenigsmann approved the request. Plaintiff was seen for a transplant evaluation on October 2, 2012. *See* Dkt. No. 20-4 at ¶ 21. During that evaluation, Dr. Maliakkal, who is not a defendant in this matter, determined that because Plaintiff had a MELD score of nine (9), it was "too early for liver transplant referral." *See id.* at ¶ 23. Since that date, the medical record makes clear that DOCCS has complied with Dr. Maliakkal's recommendations as to Plaintiff's continued treatment. *See* Dkt. No. 21. Plaintiff's claims of deliberate indifference amount to nothing more than a disagreement with the prescribed medical treatment, which is not actionable under the Eighth Amendment. *See Chance*, 143 F.3d at 703.

Moreover, the record makes clear that Plaintiff has a history of noncompliance with medical recommendations. *See* Dkt. No. 21 at Exhibits "E" and "F." Plaintiff signed numerous refusals for various medications and treatments, *see* Dkt. No. 21 at Exhibit "E," and his ambulatory health record indicates that he has repeatedly refused insulin and other prescribed medications. *See id.* at Exhibit "F;" Dkt. No. 20-4 at ¶¶ 27-28. Such refusals of medical care are deleterious to Plaintiff's health and a history of such is a contraindication to a transplant. *See* Dkt. No. 20-4 at ¶ 30.

Finally, regarding Plaintiff's claim relating to his hearing aids, Plaintiff's medical records demonstrate that Plaintiff had four (4) visits with an audiologist between August 8, 2011 and October 4, 2012. Although hearing aids were recommended and eventually ordered, Plaintiff's transfers between facilities (from Downstate C.F., a reception-only facility, to Attica C.F., then to Shawangunk C.F. so that he could receive sex offender programming, then to Walsh RMU so that

18

he could receive more intensive medical treatment, and then finally back to Attica C.F.) delayed Plaintiff's receipt of the device. *See* Dkt. No. 20-5 at ¶¶ 11-12; Dkt. No. 20-2 at ¶¶ 11-12; Dkt. No. 20-4 at ¶ 34. The delay in obtaining his hearing aids was simply not in Defendants' control.[4]

The record is devoid of any evidence even suggesting that Defendants acted maliciously in delaying or denying Plaintiff access to medical care, or to interfere with any course of treatment prescribed by the various medical professionals who treated Plaintiff while he was in DOCCS. custody. Based on the foregoing, the Court finds that the undisputed facts establish that no reasonable juror could find that any Defendant acted with deliberate indifference to Plaintiff's serious medical needs; and, therefore, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment as to Plaintiff's Eighth Amendment claims.

**G.     Plaintiff's motion to compel**

On December 17, 2012 and December 19, 2012, the Court received for filing a motion to compel in which Plaintiff seeks the production of various documents. *See* Dkt. Nos. 25 and 26. Since the Court has granted Defendants' motion for summary judgment, the Court denies as moot Plaintiff's motion to compel.

## IV. CONCLUSION

---

[4] The Court notes that an audiology appointment was requested for Plaintiff on October 4, 2012, and Plaintiff was seen on November 21, 2012. *See* Dkt. No. 36-2 at ¶ 4. During that same visit, Plaintiff was fitted for and received bilateral hearing aids. *See id.* at ¶ 5. On December 4, 2012, Plaintiff was scheduled for another appointment with the audiologist. *See id.* at ¶ 6. Plaintiff, however, cancelled the appointment, complained that his hearing aids were not working, and then threw them in the trash. *See id.*; *see also* Dkt. No. 36-2 at 8.

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 20) is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's claims are **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment (Dkt. No. 30) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion to compel (Dkt. No. 25) is **DENIED** as moot; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that, pursuant to 28 U.S.C. § 1915(a)(3), any appeal taken from this Memorandum-Decision and Order would not be taken in good faith; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 25, 2013
       Albany, New York

Mae A. D'Agostino
U.S. District Judge